O'KELLY *et al. vs.* FELKER.

1. The verdict is amply upheld by the evidence.

(*a.*) The presumption of death arising from the absence of a person who has not been seen or heard from in more than seven years, was rebutted where it was shown that he had been seen, that there were rumors as to his whereabouts, and that he left when a warrant had been issued for him, a woman of bad repute leaving about the same time.

2. The verdict is supported without the testimony of the witness who subsequently stated that he had made a mistake.

(*a.*) Jurors cannot impeach their finding. Could they do so, it does not appear that the evidence of the mistaken witness controlled the verdict.

(*b.*) Besides, diligence was not used in discovering the mistake before the verdict.

(*c.*) As a rule, that a witness, subsequently to the trial of a case, states that he made a mistake in his testimony, will not cause a new trial. A new trial will not be granted except in extraordinary cases, as in 15 *Ga.*, 550, and *Ib.*, 635.

September 11, 1883.

Verdict. Presumptions. New Trial. Jurors. Mistake. Before Judge HUTCHINS. Walton Superior Court. February Term, 1883.

On December 3, 1879, Felker caused a summons of garnishment to be served on Lester, administrator of Benjamin O'Kelly, deceased, founded on a judgment against Benjamin M. O'Kelly. The claim was based on the idea that Benjamin M. O'Kelly was an heir of the garnishee's intestate, and was served to catch whatever amount might be going from the administrator to the heir. The gar-

nishee answered that he was informed and believed that Benjamin M. O'Kelly had died before Benjamin O'Kelly, and was not, therefore, an heir of the latter; that Benjamin O'Kelly died in 1879, and Benjamin M. O'Kelly had been absent and not heard from since 1869—more than seven years before the death of the intestate. This answer was traversed.

On the trial, the evidence showed, in brief, as follows: Benjamin M. O'Kelly was under indictment, and stayed away from home, but occasionally returned to see his family. In 1869 he left; did not again return, and his family and neighbors have heard no more from him since. There was a rumor that he had left with a woman of bad repute; another woman of bad character started a rumor that he was living in Alabama.

Moore, a witness for plaintiff, testified that he knew O'Kelly; saw him in 1875, and the latter said that he was going to his home in Alabama. The witness described O'Kelly. The son and son-in-law of O'Kelly testified that that description was not like him, and the son stated that it corresponded with the description of one Joe O'Kelly.

Pierce, a witness for the plaintiff, testified that he had sold Benjamin M. O'Kelly goods in Rockdale county six or seven years since, including bagging and ties.

The jury found for the plaintiff. Defendant moved for a new trial, on the following grounds:

(1.) Because the verdict is contrary to law and evidence.

(2.) Because of newly discovered evidence. [This consisted of a statement by the witness, Pierce, that he was mistaken in testifying that Benjamin M. O'Kelly bought bagging and ties from him; that he had reference to another man named Benjamin O'Kelly. This ground was supported by the affidavit of Pierce and of counsel for the garnishee, the latter stating his ignorance of the testimony until after the trial; also by affidavits of the administrator and others, stating that they were surprised at

hearing the testimony of Pierce, and were ignorant of the mistake until after the trial.   Affidavits of two jurors were also introduced to the effect that the testimony of Pierce had weight with them in coming to a conclusion, one saying that it had a controlling influence on him. A counter-affidavit of another juror was introduced to show that the verdict was reached without relying on the testimony of Pierce.]

The motion was overruled, and the garnishee excepted.

A. L. MITCHELL, by HARRISON & PEEPLES;  C. H. BRAND, for plaintiffs in error.

H. D. McDANIEL ; J. A. FELKER ; W. J. RAY, for defendant.

JACKSON, Chief Justice.

1.  Excluding the testimony of the witness who made affidavit that he was mistaken in the O'Kelly referred to in his interrogatories, and had testified in reference to another man as having been in life within seven years of the intestate's death, there is evidence to support the verdict.  The credibility of witnesses and weight of testimony are matters for the jury ; and the single question with this court, when the presiding judge approves their finding, is, does the evidence support, or rather, is there enough in the evidence to support it ?

We think that there is.   It was much a matter of who should be credited, and the witnesses for the defendant in error were disinterested, while for the plaintiff in error all the three are closely related to the defendant in *fi. fa.*, and two of the three will get the property left by the intestate, or part of it, as heirs at law, if the defendant in execution was dead at the time the intestate died.   When they testify, therefore, to his long absence, they testify to their interest, to show the legal presumption of his death, and their heirship in his place.   Moore, one of the witnesses,

swears positively to having seen the defendant in *fi. fa.* repeatedly in Rockdale county, within seven years, and his evidence is uncontradicted and unimpeached. In addition to this, the witnesses for plaintiff in error, interested as they were, swear, one or more of them, to the effect that the defendant in *fi. fa.* left because a warrant was out against him for some crime or misdemeanor, and that about the time he left a woman of bad repute left with him, and that they had heard a rumor, originating with another bad woman, that he was living with her in Alabama; and Moore swears that, when he saw him in Rockdale, he asked him where he was going, being on horseback, and he replied, to Alabama, where he then lived.

So that on the solitary issue made and tried, to-wit, was Benjamin M. O'Kelly alive when Benjamin O'Kelly died, on the one side is the testimony of one witness wholly disinterested, who saw and talked with him within seven years, the fact that he left, fleeing from a warrant, and the rumor that he left with a disreputable woman, and was living with her in Alabama; and on the other is the fact, sworn to by two witnesses interested to show his death, that they had not heard from him since 1869, something over seven years before the death of the intestate. So that, excluding entirely the evidence of Pierce, who made affidavit that he was mistaken in the O'Kelly about whom he swore, it being Benjamin, and not Benjamin M. O'Kelly, the evidence is overwhelming, that defendant in *fi. fa.* had been seen and heard from within seven years; and the presumption of his death was rebutted by sight of him, rumors about him, a warrant out for him, and a woman leaving with him, so as to alienate him from the old wife and children, and the old home. 1 *Kelly*, 538; 39 *Ga.*, 509.

2. In respect to the ground of the mistake of the witness, Pierce, it is enough to say that the evidence is sufficient without his evidence; and that even if jurors could impeach their verdict, which they cannot do, one of the three swears that it would have made no difference at all

with him, another strikes out a good deal of the affidavit prepared for him, reducing it simply to an opinion that it strengthened somewhat the garnishee's side of the issue, and but one swore that Pierce's testimony controlled him. It is enough that they cannot impeach the verdict. Besides, there was no diligence to investigate about which O'Kelly Pierce was swearing. In his answers he named both Benjamin and Benjamin M. O'Kelly, and testifies that he sold bagging and ties in Rockdale county to the one he saw alive and was testifying about.

Plaintiff in error must have known that this man could not be the runaway from justice, whom his family had not heard from since he visited them from Florida. What would this stranger want with bagging and ties in Rockdale county, Georgia? Ordinary diligence required the plaintiff in error to look into the matter before trial.

Moreover, two of the affiants claim the discovery of the mistake of Pierce,—the son-in-law, who, the moment he heard the interrogatories, went after Pierce, and another affiant who heard the interrogatories, and then meeting Pierce, got into conversation about it with him at Rockdale court, and told the son-in-law about it, and thus he got his information.

In two cases, in 15 *Ga.*, 550, and in 54 *Ga.*, 635, this court granted a new trial grounded on the mistake of a witness. In the first case, the mistake was part of the reason for granting it; in the latter, it was the sole reason. Both were peculiar and exceptional cases. It will not do, except in extraordinary cases, to make such mistake a rule for granting a new trial. It is too tempting to parties to get affidavits of mistake from witnesses, and the temptation and tendency would be too great to bribery and perjury. The case at bar clearly is not such a one as will authorize the grant of a new trial on such a ground.

Judgment affirmed.